

**SIGNED this 29th day of November, 2022**

_Shelley D. Rucker_

Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**
**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

In re:

Derrek Wade Pugh,
    Debtor.

No. 2:21-bk-50768-SDR

Chapter 7

Marie Vernon Wolfe,
    Plaintiff,

v.

Adv. No. 2:22-ap-05002-SDR

Derrek Wade Pugh,
    Defendant.

## MEMORANDUM OPINION

### I.    INTRODUCTION

Over 12 years ago, adversary plaintiff Marie Wolfe was severely injured by a pit bull

owned by Derrek Pugh, the debtor and adversary defendant.  Plaintiff sued defendant in South

Carolina, where the attack occurred, and obtained a judgment in the amount of $700,000.00.

Defendant has not paid anything toward the judgment and has filed for bankruptcy twice.  The first

case was dismissed without resolution of this debt.  Whether this case should be dismissed without a discharge, or whether his discharge denied because of his actions in this proceeding, are the issues before the Court.

The Court held a trial on October 28, 2022 on a motion by plaintiff in the main bankruptcy case to dismiss that case under 11 U.S.C. § 707(a) and an objection to discharge under four different subsections of 11 U.S.C. § 727(a).  The Court has jurisdiction under 28 U.S.C. §§ 157(b), 1331, and 1334, and the parties previously agreed that the pending matters are core proceedings that may proceed to final judgment.  For the reasons discussed below, the Court will grant the motion to dismiss and will dismiss the adversary proceeding without prejudice.

## II.    BACKGROUND AND FINDINGS OF FACT

Pursuant to Federal Civil Rule 52(a)(1), made applicable by Federal Bankruptcy Rule 7052, this Background section will serve as the Court's findings of fact following trial.

### A.    Origin of the Plaintiff's Claim

This case traces its origins back to an injury that occurred over 12 years ago.  Defendant was a college student in Charleston, South Carolina who was preparing to move back to Tennessee.  On June 1, 2010, plaintiff came to defendant's apartment with one of defendant's friends.  Unbeknownst to plaintiff, defendant kept a pit bull in his apartment that had a prior history of aggression and of attacking people.  Defendant's dog attacked plaintiff and bit her on her face, causing severe injuries.

On April 17, 2012, plaintiff sued defendant in state court in South Carolina for actual and punitive damages in connection with the injuries that she suffered from the attack.  When defendant failed to answer the complaint, the South Carolina court found defendant in default, following a hearing and over defendant's objection.  Plaintiff proceeded to seek a judgment for damages.  After defendant dismissed his first bankruptcy case (*see* Section B below), the South Carolina court held

a damages hearing. Defendant appeared at the hearing through counsel, and his counsel cross-examined both of plaintiff's witnesses. On October 8, 2015, after the hearing ended, the South Carolina court issued an order and award of damages. (Doc. No. 31-13 at 3–10.) The South Carolina court awarded $450,000.00 in actual damages and $250,000.00 in punitive damages. The South Carolina court's order included the following findings of fact and conclusions of law:

1)     Plaintiff was lawfully on the Defendant's premises at the time of the injury. (Doc. No. 31-13 at 7).

2)     Plaintiff was seriously injured by the pit bull belonging to Defendant. (*Id.*)

3)     The attack by Plaintiff's pit bull was unprovoked by Plaintiff in any fashion. (*Id.*)

4)     Defendant kept the animal under cruel confinement and isolation, conditions contributing to the animal's aggressive nature and dangerous disposition. (*Id.*)

5)     Defendant knew or should have known, by reason of previous incidents involving the animal, that the pit bull was dangerous. (*Id.*)

6)     Defendant knew or should have known of the serious potential for attacks. (*Id.*)

7)     Defendant took no measures at the time of Plaintiff's visit to reasonably protect her from the dangerous animal. (*Id.*)

8)     Defendant's conduct in the previously mentioned respects was negligent, grossly negligent, willful, wanton and reckless. (*Id.*)

9)     "I find the defendant's conduct under the negligence cause of action rises to the level of culpability warranting a punitive damage award. Based on the admissions of facts in the Complaint, I find Plaintiff has met [her] burden of proving by clear and convincing evidence that Defendant's conduct was so reckless, willful, wanton or malicious that the Defendant should be punished." (*Id.* at 9.)

10)     "I have also considered the *Gamble* factors [for punitive damages under state law]: (1) the defendant's degree of culpability; (2) the duration of the conduct; (3) the defendant's awareness or concealment; (4) the existence of similar past conduct; (5) the likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) the defendant's ability to pay; and (8) any other factors deemed appropriate. *See Gamble v.*

*Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991).  Having carefully considered the above factors, I find the Plaintiff's testimony and the history of the case suggest a lack of remorse by Defendant.  Further, while Defendant may have not intended for his dog to bite Ms. Wolfe, he displayed willful, wanton, and reckless disregard of her safety and the safety of others because of his knowledge of the dog through his ownership.  In light of the Plaintiff's severe injuries and the facts deemed admitted in the Complaint, I find punishment is needed.   I find Defendant had foreknowledge of the dangerous pit bull's nature, contributed to the animals' dangerous nature, and put forth no effort to protect Plaintiff." (*Id.* at 10.)

On August 14, 2017, plaintiff obtained an order from Washington County Circuit Court in Tennessee confirming the South Carolina court judgment. (*Id.* at 1–2.)  That same day, plaintiff recorded the Tennessee court order with the Washington County Register of Deeds.[1] (*Id.* at 1.)

### B.    Prior Proceedings in Tennessee

#### 1)    *First Bankruptcy Case in 2013*

After the South Carolina suit had been filed, but before the judgment for damages was entered, defendant filed a voluntary Chapter 7 petition on May 10, 2013.  (Case No. 2:13-bk-50870-MPP (the "First Bankruptcy Case" or "FBC"), Doc. No. 1.)  In Schedule A, defendant disclosed that he owned real property that had a current value of $43,100.00.  That property secured a claim of $54,216.14. (FBC, Doc. No. 13 at 12.)  In Schedule D, debtor disclosed that he cosigned mortgage loans with his grandfather, James F. "Fred" Brooks, and that the balances totaled over $370,000. (*Id.* at 17.)  Defendant noted in an original and amended statement of financial affairs that he deeded his one-half interest in seven houses and one empty lot to his grandfather and that

---

[1] "A foreign judgment may be enforced in Tennessee by (a) a new common law action to enforce the foreign judgments; (b) a statutory exclusively chancery court action on the foreign judgment to subject a nonresident judgment debtor's property in Tennessee to satisfaction of the judgment; (c) registration under the uniform enforcement of foreign judgments act; or (d) where applicable, under the procedures set forth in the Uniform Interstate Family Support Act of 1997 and the Uniform Child Custody Jurisdiction and Enforcement Act of 1999." Lawrence A. Pivnick, *Enforcement of judgments rendered by foreign (non Tennessee state and federal courts)*, 2 Tenn. Cir. Ct. Prac. § 27:18 (2021–22 ed.) (citations omitted).  By obtaining an order from a Tennessee court and then recording the Tennessee order with the South Carolina judgment attached, plaintiff appears to have employed a combination of options (a) and (c) above.

the market value of the properties was less than the combined mortgage balance. (FBC, Doc. No. 13 at 4; Doc. No. 23 at 4.) Defendant also disclosed that he operated rental property with his grandfather for several years before transferring his interest in the rental properties back to his grandfather in May 2012. (FBC, Doc. No. 13 at 6; Doc. No. 23 at 7; *see also* SAP, Doc. No. 31-15 (Trial Ex. 15, quitclaim deed from defendant to James Brooks dated May 23, 2012).) An amendment to Schedule F added an unsecured loan that defendant owed his grandfather in the amount of $200,000.00 (FBC, Doc. No. 23 at 10), although his grandfather never filed a proof of claim. The Trustee filed an adversary proceeding to recover one of the properties as a fraudulent transfer. *See generally Payne v. Pugh*, No. 2:14-ap-05001-MPP (Bankr. E.D. Tenn.). In Schedule F, defendant disclosed plaintiff's South Carolina case and estimated that damages could exceed $100,000. (FBC, Doc. No. 13 at 19.) In Schedule I, defendant disclosed $636.00 in average monthly income. (*Id.* at 22.)

On August 23, 2013, plaintiff filed a motion to dismiss the First Bankruptcy Case under 11 U.S.C. § 707(a). (FBC, Doc. No. 26.) Plaintiff sought dismissal on the grounds that defendant filed for bankruptcy to avoid compensating her for her injuries and to avoid modifying his lifestyle in ways that would allow him to make payments to her. (*Id.* at 2–3.) Plaintiff also asserted that defendant failed to maintain records that would show his financial condition and that, out of the banking records that he was required to bring to his Rule 2004 examination, he brought little more than an account history from his Eastman Credit Union account that was altered to redact important information. (*Id.* at 3–4.) The Court (Parsons, *C.J.*) granted the motion, but only in a limited sense. Defendant had filed his own motion to dismiss the case (FBC, Doc. No. 54), and both motions were resolved through an agreed order setting forth that the case would be dismissed once defendant paid the Trustee $4,310.00 in costs and expenses for an adversary proceeding in which

the Trustee had sought to set aside one of the property transfers made to James Brooks. (FBC, Doc. Nos. 61, 66.)

>    2)  *First Adversary Proceeding: Objections to Discharge and to Dischargeability*

On the same day plaintiff filed the motion to dismiss, she commenced Adversary Proceeding No. 2:13-ap-05030-MPP (the "First Adversary Proceeding" or "FAP") objecting to the dischargeability of her debt on the basis that it arose from willful and malicious injury caused by defendant. Plaintiff also objected to his discharge on account of defendant's transferring his property interests to his grandfather solely to put those assets outside the reach of creditors. In support of this accusation, plaintiff noted that one property transfer occurred on June 14, 2010, just four days after the dog attack, while the other transfers occurred in May 2012, one week after plaintiff served defendant with the complaint in the South Carolina case. (FAP, Doc. No. 1 at 3.) Plaintiff also alleged that defendant failed to bring subpoenaed documents to his Rule 2004 examination and provided a bank statement that was altered and insufficient to show his financial condition. (*Id.* at 3.) Plaintiff sought either an exception to discharge of her claim under 11 U.S.C. § 523(a)(6) or a denial of discharge under 11 U.S.C. § 727(a).

Defendant responded with a motion to dismiss the count of the adversary complaint concerning Section 523(a)(6), and in a Memorandum Opinion dated May 8, 2014, the Court granted the motion to dismiss. (FAP, Doc. No. 16.) Judge Parsons concluded that plaintiff did not allege the level of intent needed to state a cognizable claim under Section 523(a)(6). The Memorandum Opinion makes apparent that plaintiff's response to the motion influenced Judge Parsons's analysis. Plaintiff did not expressly oppose the motion to dismiss:

>    In his motion to dismiss filed April 8, 2014, the debtor asserts that the plaintiff's complaint fails to state a claim for nondischargeability under § 523(a)(6) because there are no allegations that the plaintiff's injury was "willful and malicious" as required by that Bankruptcy Code section. In her response to the motion to dismiss, the plaintiff states that she did not have sufficient information to

know whether the debtor's conduct was willful and malicious at the time that she filed the complaint.  However, "[a]fter discovery, the Plaintiff does not believe that the conduct of the [debtor], although reckless and uncaring, did not rise to the level that he intended to injure the Plaintiff or knew that releasing his confined pit bull was substantially certain to result in the injuries to Plaintiff."  Reading this statement as a whole, it appears that the plaintiff's inclusion of the second "not" was a clerical error, and that she is conceding that the debtor's conduct falls short of the "willful and malicious" standard required for a determination of nondischargeability under § 523(a)(6).  Because of the slight ambiguity, however, and because the plaintiff has taken no action to withdraw her § 523(a)(6) claim or to amend her complaint in this regard, the court will briefly address the merits of the debtor's motion to dismiss.

(FAP, Doc. No. 16 at 3.)

Judge Parsons wrote the Memorandum Opinion about a year and a half before the South Carolina court made the findings of fact that appear in its order and award of damages.  In this case, plaintiff never pursued the possibility that the findings in the South Carolina order required revisiting the plausibility of a count under Section 523(a)(6).  Nor did defendant make any effort to use Judge Parsons's opinion on his lack of intent as a defense to the South Carolina proceeding although the standard to find intent might have been different in the state court case.  If anything, defendant's success in the motion to dismiss the objection to dischargeability in the adversary proceeding was used against him.  The South Carolina court used his admissions in the bankruptcy proceeding to find his affidavit regarding lack of service filed in the South Carolina case to be false.

The First Adversary Proceeding continued toward trial on an objection to discharge under Section 727(a).  The Court scheduled trial for June 12, 2014.  On the day of trial, Judge Parsons directed the parties to engage in mediation and postponed the trial.  (FAP, Doc. No. 26.)  Judge Parsons orally expressed her concern that the parties had not yet tried to reach some kind of resolution that would bring plaintiff some compensation for her injuries.  On December 4, 2014,

the parties filed a joint stipulation of dismissal "in light of the dismissal of the Debtor / Defendant's

bankruptcy proceeding."  (FAP, Doc. No. 28.)

### 3)  The Years After the Dismissal

From December 4, 2014, to the date of his second bankruptcy filing in 2021, defendant's

life took a rather tortuous path.  He had been living in Montana but returned to East Tennessee in

2015.  He resumed his work in real estate and obtained a degree in Mass Communications.  He

found some work in television and traveled to Los Angeles, where he worked off and on until

2017.  In June of 2017, he sold for $90,000 a house that his grandfather had helped him buy; he

netted $15,000 after paying the mortgage.  In August of 2017, plaintiff confirmed her judgment in

Tennessee, although there was no evidence of any further collection action after that.  Defendant

married in November of 2017 and attempted hemp farming, then took a job with Franny's Farmacy

in 2018.  Franny's closed in March 2020 with the start of the COVID-19 pandemic.  Defendant

divorced in June 2020 and subsisted for while on unemployment compensation.  Defendant's

family supplied him with a house rent-free and provided additional income earned from doing

maintenance both on the rental houses that he had returned to his grandfather in 2020 and on other

family properties.  His tax returns for 2020 and 2021 show less than $6,000 per year from this

employment.

During the pandemic, according to his testimony, defendant used his stimulus payments to

begin trading in stocks and crypto currencies.

There was no evidence that plaintiff pursued any collection action after 2017, but for a

reason unarticulated at trial, defendant decided to make a second attempt to discharge the

judgment.  There is no evidence that he was being pursued by any other creditor such as the holder

of the mortgage on the transferred lots, or by his grandfather's estate for the $200,000 unsecured

debt, both of which he had listed in the First Bankruptcy case; or by his student loan lender.

### C.     The Current Case

#### 1)  Second Bankruptcy Case

On June 14, 2021, defendant commenced the current case by filing another Chapter 7 voluntary petition.  (Case No. 2:21-bk-50768-SDR (the "Second Bankruptcy Case" or "SBC"), Doc. No. 1.)  Defendant listed the South Carolina case in his statement of financial affairs without checking off whether the case was pending, on appeal, or concluded.  (*Id.* at 10.)  Defendant disclosed that, in the two years preceding the petition, he transferred $4,000.00 to Robinhood Financial, LLC ("Robinhood") to fund a day trading and crypto currency account.  (*Id.* at 12.)  In Schedule A/B, defendant listed the Robinhood account with a balance of $2,295.36.  Defendant listed two other brokerage accounts: an account with Crypto.com with a balance of $2,051.84; and an account with Webull with a balance of $138.69.  (*Id.* at 20.)  Schedule E/F disclosed plaintiff's judgment in the amount of $700,000.00.  (*Id.* at 31.)  Schedules I and J showed a monthly income of $2,024.00 (solely from unemployment compensation), monthly expenses of $1,515.00, and a monthly net income of $509.00.  (*Id.* at 37, 39.)  The Trustee filed a report of no distribution on July 23, 2021.  (SBC, Doc. No. 14.)  The transfers to defendant's grandfather that were the focus in the 2013 case were now well beyond any period when they could be avoided.

On September 16, 2021, plaintiff filed a motion to dismiss the Second Bankruptcy Case under Section 707(a).  (Doc. No. 15.)  The motion contains arguments that are similar to the motion to dismiss that plaintiff filed in the First Bankruptcy Case and that were not adjudicated on the merits before the parties resolved the motion by agreed order:

| Issue | FBC | SBC |
|-------|-----|-----|
| Good Faith | "Good faith is lacking in the debtor's petition for relief.  The filing of this bankruptcy case is for the sole purpose of avoiding payment to the movant." (FBC, Doc. No. 26 at 2.) | "Good faith is lacking in the debtor's petition for relief.  The filing of this bankruptcy case is for the sole purpose of avoiding payment to |

| Issue | FBC | SBC |
|---|---|---|
|  |  | Wolfe, and it is the debtor's intent to avoid that large single debt." (SBC, Doc. No. 15 at 3.) |
| Transfers | "The debtor has transferred numerous parcels of real estate to an insider, his grandfather, from the date of the injury to movant.  The first transfer occurred June 14, 2010, four days after the incident occurred.  The second transfer occurred on May 23, 2012, one week from service of the complaint upon Mr. Pugh.  In all, the debtor conveyed ten parcels of property to his grandfather during that period of time.  These transfers represent a deliberate and persistent pattern of placing his assets outside the reach of movant." (FBC, Doc. No. 26 at 2–3.) | "At least since June 2010, the debtor has employed a deliberate and persistent pattern of evading Wolfe, who is his single major creditor, and he has continuously and systematically transferred assets in order to keep them from being used to satisfy his debts to creditors, including Wolfe." (SBC, Doc. No. 15 at 3–4.) |
| Process | "The debtor attempted to evade legal process and signed a false affidavit with the court in South Carolina to contest service of process by that court." (FBC, Doc. No. 26 at 3.) | "The debtor attempted to evade service of process and signed a false affidavit with the South Carolina court in order to contest service of process." (SBC, Doc. No. 15 at 2.) |
| Records | "The debtor was deposed by movant's counsel pursuant to a Rule 2004 Order. In connection with that proceeding, he was commanded to bring, through subpoena, all banking records for any account in which he had signatory power for the years 2010–present. He failed to bring those records to the deposition.   The debtor agreed to furnish those records as a late-filed exhibit to his testimony.  He provided an account history from January 31, 2012 to July, 2013 which appeared to have been printed from and Eastman Credit Union website. He stated that he could not furnish any additional information as he would be charged by the bank.  It appears that this history had been altered to redact deposit sources and transfer recipients.  The document provided is not adequate to | "In case No. 13-50870, the debtor was examined by Wolfe under a Rule 2004 order and commanded through subpoena to bring with him all banking records for any account in which he had signatory power for years 2010 to the date of the examination. The debtor failed to do so and instead supplied a single document, which was apparently altered and which purported to be bank records for a period of a year and a half." (SBC, Doc. No. 15 at 2.) |

| Issue | FBC | SBC |
|-------|-----|-----|
| | determine sources of income or to whom money was transferred." (FBC, Doc. No. 26 at 3–4.) | |
| Disclosure | "The debtor has failed to maintain records from which his financial condition can be determined." (FBC, Doc. No. 26 at 4.) | "As in bankruptcy case No. 13-50870, the debtor claims in the pending case to have few assets and little income.  Despite these claims, the debtor has been employed over the past several years, including as a licensed real estate agent and a licensed hemp grower.  For at least the past two years he has been day trading, selling stock, and dealing in crypto currency.  During 2017, he sold real property titled in his own name and located at 285 Pactolus Road in Kingsport, Tennessee, for $90,000.00.    During   2020,   he received $3,628 in capital gains proceeds . . . . The debtor has failed to explain his loss of assets or deficiency of assets to meet his liabilities and has failed to make a candid and full disclosure.    The debtor has failed to maintain records from which his financial condition can be determined." (SBC, Doc. No. 15 at 3–4.) |

Because the dismissal of the First Bankruptcy Case occurred by stipulation with no prior dismissals based on the same claims, the dismissal was without prejudice.  *See* Fed. R. Civ. P. 41(a)(1)(B); Fed. R. Bankr. P. 7041.  The Court has prepared the above table not to suggest any issue of preclusion that the parties themselves have not raised but only to show the parties' litigation history as it affects the analysis below.

2)  *Second Adversary Proceeding*

On February 18, 2022, plaintiff commenced Adversary Proceeding No. 2:22-ap-05002-SDR (the "Second Adversary Proceeding" or "SAP") within the Second Bankruptcy Case.

Though the counts are not labeled separately, the complaint effectively contains four counts asserting a basis for a denial of defendant's discharge—Sections 727(a)(2), (3), (4), and (5). Plaintiff incorporated the motion to dismiss in the Second Bankruptcy Case by reference and pled three main factual bases to support the four counts:

> Without limitation, the defendant claims in his petition, statement of financial affairs, and schedules to be unemployed. At least until July 2021 he received unemployment compensation benefits. Despite the defendant's claim, he has been employed by his grandmother, Marie J. Brooks, from 2015 to at least 2021 to maintain various properties she owns. In his petition, statement of financial affairs, and schedules, the defendant lists no income from his grandmother, and the defendant either will not or cannot state how much income he has derived from his employment by her.

> Without limitation, the defendant's bank account statements between July 2019 and October 2021 show numerous deposits that do not correspond to the defendant's unemployment compensation benefits, withdrawals or distributions from the defendant's trading accounts, or any other source of revenue shown in the defendant's petition, statement of financial affairs, and schedules. The defendant either will not or cannot state the source of those deposits, and the defendant does not show the deposits as income in his petition, statement of financial affairs, and schedules.

> Without limitation, the defendant actively trades securities and deals in crypto currency through at least three accounts with Robinhood, WeBull, and Crypto.com. The defendant either will not or cannot produce account statements for the Robinhood account before January 2021, except for a 1099 for tax year 2020. The defendant either will not or cannot produce account statements for the WeBull account for several months of 2021. For the Crypto.com account, the defendant either will not or cannot produce an account number or any records whatsoever, except for a single spreadsheet that is devoid of meaning, even to the defendant.

(SAP, Doc. No. 1 at 2.)

The parties did not file any motions to compel discovery or any dispositive motions but proceeded to file briefing and exhibits for trial. The parties did participate in one call with the Court in which the Court limited the production of documents to four years before filing and required additional disclosures by plaintiff regarding the basis of her objections to defendant's discharge.

### 3)  Trial: Exhibits

The parties stipulated to have all of their trial exhibits entered into evidence.  The exhibits included the transcript of defendant's January 13, 2022 deposition, which plaintiff was permitted to use for any purpose regardless of defendant's availability. Fed. R. Civ. P. 32(a)(3) ("An adverse party may use for any purpose the deposition of a party . . . ."); *see also Cmty. Counselling Serv., Inc. v. Reilly*, 317 F.2d 239, 243 (4th Cir. 1963) ("It has been consistently held that the Rule permits a party to introduce, as part of his substantive proof, the deposition of his adversary, and it is quite immaterial that the adversary is available to testify at the trial or has testified there.") (citations omitted); *Eastman Chem. Co. v. SGS N. Am., Inc.*, No. 2:15-CV-344, 2019 WL 10960575, at *7 (E.D. Tenn. Feb. 4, 2019) (permitting the use at trial of the deposition testimony of a Civil Rule 30(b)(6) corporate representative, regardless of the representative's availability).

The exhibits fall into several categories of information.  Each category below impacts plaintiff's trial theme that defendant withheld information to prevent her from making an accurate assessment of his finances, which in turn delayed and abused the bankruptcy process.

### a)  Discovery Demands and Responses Generally

During discovery, plaintiff wanted to know every place where defendant worked; every occupation that defendant had; every place where defendant lived; and every bank account that defendant had from June 1, 2010 to the present.  (SAP, Doc. No. 31-3 at 1–2.)  About a third of the requested time period would have fallen during the pendency of the First Bankruptcy Case. Defendant objected to the time period without citing why (*id.*); following a discovery call, the Court ordered disclosure back to June 14, 2017, four years prior to filing and a reasonable period for disclosure.  Defendant did the same for credit card information.  (*Id.* at 4.)  Defendant subsequently supplemented his responses.  (SAP, Doc. No. 31-5.)

Plaintiff deposed defendant on January 13, 2022, and the transcript was offered as defendant's direct testimony.  The transcript provides additional information about defendant's employment history.  Defendant attempted a business as a hemp farmer, but the business failed because the market "was too flooded."  (SAP, Doc. No. 31-11 at 2.)  Defendant did not renew his license for that business.  Defendant also holds a realtor license that is inactive.  Defendant did explain that he assisted a now-deceased uncle repair a property to prepare it for sale in 2017.  (*Id.* at 4.)  Defendant's uncle issued him a 1099-C tax form for his work.  Defendant's tax return for 2017 did not list an amount that he was paid for his work.  Defendant currently performs odd jobs and runs errands for his grandmother but does not own a working vehicle.  He uses one owned by another member of his family.  In the deposition, defendant explained what he believed was the impact of the judgment on him:

> It's prevented me from being able to live a normal life, even to obtain normal things, do anything in my life, you know, by somebody who—you know, I—I haven't made $700,000 in my entire life, but you all pursue me like I'm some big hotshot, you know.  It's almost—it's almost flattering.  I wish I had a fraction of the way that you talk to me, you know?  But it's just ridiculous that you won't let me get on with my life when it's obvious . . . .

(*Id.* at 4.)

### b)  Tax Information

In his Statement of Financial Affairs, defendant disclosed $3,628.00 of gross income in 2020 and provided the following explanation: "Capital Gains proceeds.  No gain after cost."  (SBC, Doc. No. 1 at 9.)  When plaintiff sought details, defendant answered as follows: "I actually did not receive a capital gain on the sale of Robinhood sales in 2020, my purchase cost was $4,917.98 and my selling price was $3,626.65; resulting in a capital loss of $1,101.93.  The information in Statement of Financial Affairs question 5 was not correct to the extent it states this was a capital gain."  (SAP, Doc. No. 31-3 at 4.)

c) Bank and Financial Account Information

Defendant furnished statements from July 2019 to October 2021 for Eastman Credit Union. (SAP, Doc. No. 31-4 at 4.)  Defendant claimed to be unable to respond to a similar request for bank records from Bank of America because he closed the account in September 2018 and no longer had access to it.  (*Id.* at 5.)  Defendant provided tax returns for 2016 through 2020 without any apparent objection from plaintiff.  (*Id.* at 9.)  Of these, only the tax returns for 2018, 2020, and 2021 were admitted as trial exhibits.  Defendant also provided IRS correspondence from 2018 and 2020 along with a copy of Form 8949 that was attached to his 2020 federal tax return.  (*Id.* at 11.)  For the Robinhood, Crypto.com, and Webull accounts, defendant furnished statements and an annual tax document for Robinhood; and 2021 account app screenshots for Crypto.com and Webull.  (*Id.* at 6--8.)  Defendant objected to furnishing statements for closed credit card accounts.  (*Id.* at 12.)   Defendant also objected, albeit without explanation, to furnishing documents pertaining to the transfer of his real property interests to his grandfather.  (*Id.* at 13–14.)  For the trial in the First Adversary Proceeding, the parties stipulated to admit into evidence collective exhibits concerning warranty, quitclaim, and other deeds for any real property interests that defendant transferred to his grandfather between a year before the filing of the First Bankruptcy Case and the time of trial.  (FAP, Doc. No. 21 at 4.)  The quitclaim deed from defendant to his grandfather related to the 2010 real property transfers and were admitted at this trial as Exhibits 14 and 15.  The August 28, 2009 quitclaim deed to defendant's grandfather was admitted as Exhibit 47.  The Court notes that the recording date of this deed was June 7, 2010.

In her third request for production dated June 17, 2022, plaintiff asked defendant to produce his "phone and other devices in order to have an independent party access information as to the debtor's Robinhood, Webull, and Crypto.com trading accounts."  (SAP, Doc. No. 31-10 at 1.) Plaintiff made the request because defendant asserted in his deposition that his Robinhood,

Crypto.com, and Webull accounts did not produce regular statements as bank accounts do; current balances and transaction information allegedly could be viewed only through the app for each account that defendant had on his mobile phone.[2]  Defendant objected to any suggestion that he should surrender his phone to third parties but counter-offered "to give an authorized qualified independent person or entity the usernames and password for each account to allow access to the same information available to Debtor." (*Id.*)  No supervised or unsupervised third-party review of defendant's accounts ever occurred.  Defendant's deposition featured some questioning about why these accounts would not have statements or, if statements are not available, how defendant would have known the value of his accounts when he filed his statements and schedules.

The Court has reviewed the exhibits that defendant furnished for his Robinhood, Crypto.com, and Webull accounts.  The Court agrees with plaintiff that the screenshot showing a balance of $1,901.18 in the Crypto.com account (SAP, Doc. No. 31-33) is difficult to understand without context.  A supervised review of the account arranged by counsel likely would have provided that context, but plaintiff should not have been expected to prepare for a review without more documentation.  The spreadsheets purportedly showing Crypto.com transactions (SAP, Doc. Nos. 31-34 to 31-36) appear to show mostly exchanges from one form of token or virtual currency to another—*e.g.*, the use of 48.216 Cronos worth $6.72 to purchase 200,000 Shiba Inu altcoins (SAP, Doc. No. 31-34 at 1)—with only a few deposits into the account of small amounts.  Plaintiff is correct that the spreadsheets are largely difficult to understand and difficult to reconcile with Form 8949, though some of the line items in the spreadsheets do correspond to the transactions that defendant disclosed in IRS Form 8949 of his 2021 federal tax return.  What concerns the Court

---

[2] Considering that mobile phone apps usually are simplified versions of full websites that users can access on a desktop or laptop computer, the parties never clarified whether they discussed access to the full websites.

even more is defendant's claims of ignorance in light of the detailed Forms 8949 attached to his 2020 and 2021 tax returns, which were self-prepared.

Increasing the Court's doubt about defendant's candor is what appears to be a flagrant misrepresentation by defendant about what information he could provide from his crypto currency accounts. Defendant stood by the limited transaction histories that he provided and made repeated assertions that providing more information was impossible:

- "I gave you everything that I could obtain from Robinhood." (SAP, Doc. No. 31-11 at 12.)

- "Q. Now, my question is, is there a reason why you can't produce monthly statements for the Robinhood account for each month for the year 2020 or any month before 2020 during which you had the Robinhood account? A. The reason why is because they are not available. I gave you everything that is available, like I just said. Q. Okay. All right. And that's—that's from the inception of this Robinhood account? A. I gave you everything I could find." (*Id.*)

- "Like I said, I'm not a financial manager. I don't understand the formats of these papers. I have no clue what that is. You should call them." (*Id.* at 13.)

- "I gave you literally everything that [can] possibly be found." (*Id.* at 16.)

- "I gave you all the information that was available. Go login and look. It's all the information, and . . . . Q. Okay. A. . . . so I don't even understand what you're trying to do here. Q. Well, you—you said log in and look. A. Go for it. Q. May I have access to your Crypto.com account? Mr. Greer: No. The Witness: No. I mean, that's stupid. Mr. Greer: He said he's produced all that is available to him." (*Id.* at 18.)

The Court may take judicial notice of the existence of publicly available information as long as it does not make a determination about the accuracy of that information. *See, e.g., Orshan v. Apple Inc.*, No. 5:14-CV-05659-EJD, 2018 WL 1510202, at *3 (N.D. Cal. Mar. 27, 2018) (citations omitted); *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 119 (E.D.N.Y. 2013) (citations omitted). In this instance, the Court takes judicial notice of the following online search results:

- A Google search for the phrase "how to download Robinhood transactions" yields one search result advising that a trade history can be downloaded using the Robinhood extension on the Chrome web browser. The search also yields numerous discussion threads, YouTube videos, and websites offering information about how to export

17

Robinhood transaction data or to download account documents. *See, e.g.*, "*Finding your account documents*," https://robinhood.com/us/en/support/articles/finding-your-account-documents/ (last visited Nov. 29, 2022).

- A Google search for the phrase "how to download Crypto.com transaction history" yields a similar variety of search results. *See, e.g.*, Lim How Wei, *How to Download Your Transaction History on Crypto.com*, https://www.followchain.org/crypto-com-transaction-history/ (last visited Nov. 29, 2022).

- A Google search for the phrase "how to download Webull transaction history" also yields numerous results offering information. *See, e.g., How do I get my monthly statement and trade confirmation?*, https://www.webull.com/help/faq/427-How-do-I-get-my-monthly-statement-and-trade-confirmation (last visited Nov. 29, 2022).

A careful review of search results likely would find that some websites were more useful than others; nonetheless, two of the three examples provided above are from the websites of defendant's account providers themselves. The Court's point is that defendant's vehement denial of the possibility of additional information was so implausible that it needed to confirm that the denial was false. Regardless of whether defendant lied or just could not be bothered to check, his misrepresentation prolonged discovery needlessly and injected uncertainties into the proceedings for no good reason.

Another area where the Court questioned defendant's credibility was his explanation of the sources of deposits into his Eastman Credit Union account. In all of the statements that he furnished from Eastman Credit Union from July 2019 to his filing, defendant's accounts consistently appeared with a Member Number ending in 8890; a savings account (or "primary share account") with a number ending in 3290; and a checking account with a number ending in 3307. Defendant testified that he was working at Franny's Farmacy, but the deposits for this period only reference deposits or "remote" deposits. Many of the deposits are round numbers without a specific pattern, ranging from $200 to $5,000 between July 2019 and June 2021. From April to November 2020, defendant's primary source of income was unemployment benefits, and his income averaged about $4,000 a month. Some of the statements indicate online transfers into or

out of defendant's checking account from checking accounts with account numbers ending in 7480, 7472, 6805, or 6813.  In the aggregate, the statements show a net deposit to defendant from the 7480 Account of $1,016.27; from the 7472 Account of $447.00; from the 6805 Account of $275.00; and from the 6813 Account of $50.00.  There was some suggestion during his deposition that the accounts might have belonged to family members loaning or gifting money to defendant (*see, e.g.*, SAP, Doc. No. 31-11 at 11), but defendant insisted that he could not provide confirmation.  The record does not appear to show either any effort by defendant to clarify who owned those accounts or any attempt by plaintiff during discovery to obtain that clarification.  At trial, defendant appeared to have given the issue more thought and concluded that the accounts were accounts that might have belonged to his ex-wife.

### d)  Property Information

For the trial in the First Adversary Proceeding, the parties stipulated to admit into evidence collective exhibits concerning warranty, quitclaim, and other deeds for any real property interests that defendant transferred to his grandfather between a year before the filing of the First Bankruptcy Case and the time of trial.  (FAP, Doc. No. 21 at 4.)  Plaintiff nonetheless asked in the Second Adversary Proceeding for details about the consideration that defendant received for those transfers.  (SAP, Doc. No. 31-3 at 5.)  Defendant did not answer the request and offered a boilerplate objection about the request being unreasonable, burdensome, and irrelevant.  (*Id.*)

### 4)  Trial: Live Testimony

The Court held a one-day trial on October 28, 2022.  Plaintiff did not appear in person; she appeared only through counsel.  Plaintiff called no witnesses in her case-in-chief.  Plaintiff did not cross-examine the sole defense witness, defendant himself.  Instead, plaintiff relied on the exhibits that the parties stipulated into evidence, and counsel made an opening statement and closing argument based on those exhibits.

Defendant did appear and testify.  Defendant was most credible when discussing his educational and career background.  Defendant testified that he graduated from high school in 2004 and started that year running errands and working odd jobs for his grandfather's real estate and construction business.  Defendant went back to school in 2008 after the recession began; he attended some college in Tennessee but later transferred to South Carolina.  Defendant returned to Tennessee in 2010.  Sometime after returning, one of defendant's friends helped him get a job at Montana State University.  Defendant worked in Montana for about two years and then returned to Tennessee.  Defendant eventually pursued a career related to mass communications and film; his pursuits led him to work in California and North Carolina, but the pandemic led to the elimination of many jobs in the movie industry.  Defendant holds a Tennessee realtor's license, but it currently is retired to avoid the payment of license fees.  Defendant testified that reactivating the license would cost several thousand dollars.  Defendant's employment history and income history from 2014 to the present was described above.  The Court generally found defendant credible when he discussed details about his educational and employment history.

Accounting for his income and the financial details of his business endeavors during the period since the attack left the Court with a different impression.  The Court found defendant not credible to the extent that he insisted that numerous details about his work for his family and about his investments lie beyond his grasp.  At trial, defendant described his work for his grandfather in little detail beyond simple errands, "following his lead," or "whatever he told me to do."  Defendant testified simultaneously that his grandfather did not want to involve himself in any more real estate projects following the 2008 recession; and that his grandfather directed him to sign over his interest in two real estate parcels in 2009, to allow his grandfather to be the sole owner.  Defendant testified that the real estate transfers in 2010 occurred for the same reason.  For all of

the real estate transfers, defendant implied that he did not know why his family directed him to transfer his ownership interests for zero consideration.  He was uncertain about the details of the debt obligations that he had signed related to the properties.  Additionally, defendant testified that the 2010 transfers occurred just four days after his dog attacked plaintiff and that, for that reason, they were not motivated by a need to protect those assets; he did not know that litigation was likely.  To the extent that defendant meant that he could not anticipate exactly how plaintiff would seek redress, his testimony was technically credible; but to the extent that defendant suggested that he could not have known at all that the attack would have repercussions beyond June 10, 2010, his suggestion was implausible.  The timing of the recording of the 2009 transfer after the attack and the other transfers back to his grandfather after litigation began is simply too coincidental for the Court to ignore.  Defendant did not explain why the property transfers occurred in May 2012, one week after plaintiff served defendant with the complaint in the South Carolina case.  Defendant was evasive about who paid for his legal representation in South Carolina.  Equally evasive and implausible was defendant's testimony that he was simultaneously sophisticated enough to hold a real estate license but not knowledgeable enough to understand the financing related to the properties that he held with his grandfather.  In a similar way, defendant was able to open multiple accounts to trade stocks and crypto currency and to report those transactions on his tax returns but could not download statements and transaction histories.  The Court was left with a firm impression that, on his own or at the direction of family members, defendant has decided that he does not need to share the details of his family transactions or his investments with his creditors.

21

### III.    DISCUSSION / CONCLUSIONS OF LAW

The Court now will proceed to state its conclusions of law as required by Civil Rule 52(a)(1).

#### A. Dismissal Under Section 707(a)

##### 1)    Section 707(a) Generally

Under 11 U.S.C. § 707(a), the Court may dismiss a Chapter 7 case only "for cause." Plaintiff bears the burden of proving cause for dismissal under Section 707(a) by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Simon v. Amir (In re Amir)*, 436 B.R. 1, 16 (B.A.P. 6th Cir. 2010) (citations omitted).  The statute does not define "cause," but it uses the word "including" to introduce three examples of cause: "(1) unreasonable delay by the debtor that is prejudicial to creditors; (2) nonpayment of any fees or charges required under chapter 123 of title 28; and (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee."  *Id.*  The use of the word "including" means that cause for dismissal can manifest itself in other ways.  *See* 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"); *Indus. Ins. Servs. v. Zick (In re Zick)*, 931 F.2d 1124, 1126 (6th Cir. 1991) ("We are satisfied that the word 'including' is not meant to be a limiting word.") (citations omitted).

##### 2)    Section 707(a), Bad Faith, and BAPCPA

Plaintiff argues for dismissal here under one frequently litigated basis for cause that does not appear on the face of the statute: bad faith.  The Sixth Circuit decided in 1991, in *Zick*, "that lack of good faith is a valid basis of decision in a 'for cause' dismissal by a bankruptcy court" in a Chapter 7 case.  *Id.* at 1127.  Fourteen years later, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), 109 Pub. L. 8, 119 Stat. 23 (2005),

which created a new provision currently numbered 11 U.S.C. § 707(b)(3).  Section 707(b)(3) is

the only part of Section 707 that mentions bad faith explicitly as a potential factor in favor of

dismissal, but only in the context of Section 707(b)(1) and individual debtors "whose debts are

primarily consumer debts."  "The issue of whether bad faith is grounds for dismissal under section

707(a) was resolved by Congress in the 2005 amendments to the Bankruptcy Code, at least for

debtors with primarily consumer debt."  6 *Collier on Bankruptcy* § 707.03 (16th ed. and 2022

Supp.) (citing BAPCPA).  Some courts have interpreted the BAPCPA amendment to mean that

Congress could have chosen to make bad faith an explicit factor under Section 707(a) but did not.

Going forward, under this reasoning, "a finding of 'cause' is limited to 'egregious cases' under

*Zick*."  *In re McVicker*, 546 B.R. 46, 54 (Bankr. N.D. Ohio 2016).  Other courts have rejected the

negative implication analysis or have inverted it by reasoning that Congress must have been aware

of cases like *Zick* and chose not to address them.  *See, e.g., Perlin v. Hitachi Cap. Am. Corp.*, 497

F.3d 364, 371 (3d Cir. 2007) ("Congress would not have considered its treatment of dismissal

procedures for consumer filings under section 707(b) to go hand in hand with the dismissal

provisions under section 707(a).") (internal quotation marks and citation omitted); *In re Tow*, No.

14-61665, 2016 WL 74741, at *2 (Bankr. N.D. Ohio Jan. 5, 2016) ("Congress' failure to limit *Zick*

constitutes acceptance of its holding."); *In re Boca Vill. Ass'n, Inc.*, 422 B.R. 318, 323 n.1 (Bankr.

S.D. Fla. 2009) (discussing *Perlin* and concluding that "Debtor's negative implication argument

that Congress elected not to add a good faith requirement under § 707(a) when it modified § 707(b)

is similarly unpersuasive to this Court.").  For the sake of the Second  Bankruptcy Case before it,

this Court acknowledges that BAPCPA might have created some uncertainty about bad faith under

Section 707(a) but will continue to apply *Zick* until the Sixth Circuit revisits the issue.  *Cf., e.g.,*

*Arendale v. City of Memphis*, No. 05-2190 B, 2006 WL 3053402, at *5 (W.D. Tenn. Oct. 24, 2006)

(following Sixth Circuit precedent until the Sixth Circuit itself decided that congressional amendments superseded the precedent); *see also Cooper v. MRM Inv. Co.*, 367 F.3d 493, 507 (6th Cir. 2004) ("Implied overrulings, however, are disfavored.") (citations omitted); *Hall v. Eichenlaub*, 559 F. Supp. 2d 777, 782 (E.D. Mich. 2008) ("In the absence of Supreme Court precedent directly on point, a district court should decline to 'underrule' established circuit court precedent.").

### 3) Bad Faith Factors Under Section 707(a)

Since Section 707(a) neither forecloses nor offers guidance on "cause" factors that can be considered outside the statutory text, the range of permissible factors has evolved over the years on a case-by-case basis.  One court compiled the existing factors into a list that many other courts have used as a reference when considering dismissal for cause based on bad faith:

1. The debtor reduced his creditors to a single creditor in the months prior to filing the petition.

2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle.

3. The debtor filed the case in response to a judgment pending litigation, or collection action; there is an intent to avoid a large single debt.

4. The debtor made no effort to repay his debts.

5. The unfairness of the use of Chapter 7.

6. The debtor has sufficient resources to pay his debts.

7. The debtor is paying debts to insiders.

8. The schedules inflate expenses to disguise financial well-being.

9. The debtor transferred assets.

10. The debtor is over-utilizing the protection of the Code to the unconscionable detriment of creditors.

11. The debtor employed a deliberate and persistent pattern of evading a single major creditor.

12.     The debtor failed to make candid and full disclosure.

13.     The debts are modest in relation to assets and income.

14.     There are multiple bankruptcy filings or other procedural "gymnastics."

*In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995) (citations omitted).  This list, or others that courts might devise, should not be treated like a mathematical formula.  "There is no single test for determining whether a bankruptcy petition was filed in good faith and the facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases.  The inquiry is fact-specific and must be made on a case-by-case basis under a totality of the circumstances."  *Riddle v. Greenberger (In re Riddle)*, No. 19-8022, 2020 WL 3498438, at *7 (B.A.P. 6th Cir. June 29, 2020) (internal quotation and editorial marks and citations omitted); *see also Janvey v. Romero*, 883 F.3d 406, 412 (4th Cir. 2018) ("These tests are meant to be guides only.  A bankruptcy court need not mechanically tick off each factor and tally up its tick-marks at the end.  It may be the case that many factors are relevant, or it may be the case that relatively few of them are.  It all depends.  Evaluating these factors and their comparative relevance is a discretionary exercise that is best left to bankruptcy judges.") (citing *Spagnolia*).  Inquiries under Section 707(a) ultimately are "geared toward maintaining the integrity of the bankruptcy process." *In re Weeks*, 306 B.R. 587, 589 (Bankr. E.D. Mich. 2004) (citation omitted); *see also In re McFadden*, 477 B.R. 686, 693 (Bankr. N.D. Ohio 2012) ("Section 707 dismissals are not intended to hammer a debtor for being a bad person.  Rather, they are reserved for cases where debtors are trying to undermine the integrity of the bankruptcy system.").

Plaintiff has focused her argument on *Spagnolia* factors 2, 3, 4, 5, 9, 10, 11, 12, and 14. (SAP, Doc. No. 32 at 11.)  The Court will examine each factor in turn.

25

*4)  Failure to Make Lifestyle Adjustments*

When courts review lifestyle in the context of Section 707(a), they generally focus on debtors who "are merely attempting to preserve their comfortable standard of living at the expense of their creditors."  *Rahim v. Pacifica Loan Four, LLC (In re Rahim)*, 449 B.R. 527, 534 (E.D. Mich. 2011).  For example, two physicians' attempt to use Chapter 7 to wipe away over $6.6 million of unsecured debts was dismissed, where the debtors failed to disclose three luxury vehicles that their medical practice was paying for their personal use; maintained monthly mortgage payments of $14,503 and $4,957 for a primary residence and a vacation home; and spent $4,575 per month in education expenses for two children.  *Id.* at 529.  Dismissal was warranted where a debtor made no adjustments to a lifestyle that included a high lease payment on a luxury car and voluntary contributions to both a 401(k) retirement plan and to the graduate school expenses of an adult child.  *In re Emge*, 226 B.R. 396, 400 (Bankr. W.D. Ky. 1998).  Extensive real estate holdings, and expensive house furnishings including a $7,000 stove, will weigh in favor of dismissal.  *Merritt v. Franklin Bank, N.A. (In re Merritt)*, 211 F.3d 1269 (6th Cir. 2000) (table case).  Even on a smaller scale, "monthly expenses of $650.00 for food, $550.00 for recreation/entertainment, and $610.00 for transportation for one individual with no dependents is excessive."  *In re Eddy*, 288 B.R. 500, 507 (Bankr. E.D. Tenn. 2002).  In contrast, income and an insufficient reduction of expenses might require examination under Section 707(b) but would not support dismissal under Section 707(a) unless "the debtor had exhibited bad faith in such an egregious manner as to be flaunting the bankruptcy system."  *Weeks*, 306 B.R. at 591 (citations omitted).  Alleged ability to pay, by itself, will not support a finding of egregious behavior and a dismissal for bad faith.  *See, e.g., In re Mohr*, 425 B.R. 457, 467 (Bankr. S.D. Ohio).

Dismissal for bad faith under the lifestyle factor also can occur when a debtor attempts to suppress the income that he would have to report by manipulating the timing of employment.  For

example, a debtor cannot voluntarily quit his job in the face of an IRS levy; file a Chapter 7 petition; insist that the "snapshot rule" means that he has no income for purposes of his case; and then resume his job a short time later while maintaining excessive spending habits. *In re Keebler*, 106 B.R. 662, 664 (Bankr. D. Haw. 1989). "Congress never intended that bankruptcy be a refuge for the unscrupulous and cunning individual." *Id.* (citation omitted). Suspicious timing, though, has to come with at least some suggestion of intent to manipulate the bankruptcy process; a change of employment that occurred post-petition or after some major decision in a bankruptcy case would not prompt further inquiry under Section 707 if the debtor had been seeking employment actively and consistently. *See In re Huval*, No. 05-51962, 2006 WL 2846882, at *1 (Bankr. W.D. La. June 21, 2006) (dismissal under Section 707(b) denied where "[t]here was no suggestion that the Debtors in any way manipulated Mrs. Huval's employment—she had been actively seeking employment and had no inkling that the position she ultimately obtained was available or was to become available.").

What all of the above cases have in common is the flaunting of the bankruptcy process as the threshold for determining when a debtor should have made additional lifestyle adjustments. Ability to pay, by itself, can be addressed in other ways. The lifestyle factor under *Spagnolia* addresses debtors who actively manipulate their employment status or income to hinder or delay their creditors; or who at least show indifference to the bankruptcy system's long-stated goal of helping honest but unfortunate debtors who tighten their belts and who have earnestly tried to pay their creditors.

The above context helps the Court decide that defendant here does not satisfy the lifestyle factor. Without saying so explicitly, plaintiff effectively argues here that defendant is like the debtor in *Keebler*, intentionally representing that he has a very small income, no vehicle, and no

home to manipulate the bankruptcy process until he receives a discharge and thereby defeats the judgment.  The Court does not see the threshold level manipulation in defendant's education and career history.  Over the years, defendant did work multiple jobs for short periods of time, but plaintiff presented insufficient evidence that any particular employment decision coincided only with events in a bankruptcy case and not with other family events such as defendant's grandfather's illness and death, or the effect of the pandemic on his television career or his retail business.  At the same time, plaintiff presented no evidence that defendant has continued to incur the same kinds of debts that he might have incurred pre-petition.  *Cf., e.g., Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253, 1274 (11th Cir. 2013) (lifestyle factor, and dismissal, sustained where debtor "admitted that, despite his debts, he cosigned on his sister's car loan, leased a new luxury vehicle for himself in 2010, and every month transferred thousands of dollars to his wife while she, in turn, spent $2,000 per month on credit cards and invested $2,000 per month in her 401(k).").  Other than a bump in income due to the stimulus payments and enhanced unemployment benefits, defendant's income has been relatively stable since 2019.  Plaintiff notes correctly that defendant has held a realtor's license, but no evidence was provided that defendant ever made more income as a realtor on transactions other than selling his own or his uncle's property.

The only other area where plaintiff has argued manipulation of income involves the rental properties.  The transfers of income-producing property to defendant's grandfather; his almost 90-year-old grandmother's continued ownership of those properties; his mother's handling of those assets and hiring him to provide services for those properties; and his current job as a caregiver to his grandmother all imply that the timing of this case is related to defendant's prospects for a substantial inheritance.  However, when asked directly at trial whether he anticipated acquiring

any assets in the near future, defendant said no.  Plaintiff did not cross-examine him or offer any

rebuttal testimony.  At best, plaintiff showed that defendant received some income providing

services to the rental properties but failed to show that the timing of that income was related to her

attempts to collect the debt.  Plaintiff did not carry her burden to show a family conspiracy to

provide defendant with the benefits of ownership without subjecting assets to attachment by

plaintiff.

Overall, plaintiff has not convinced the Court that defendant has planned to keep away

from a lucrative profession until he finds himself in more favorable circumstances.  For these

reasons, the lifestyle factor does not support plaintiff's claim of bad faith.

5) *Intent to Avoid a Large Single Debt, and Deliberate and Persistent Evasion of
a Single Major Creditor*

The Court has combined these two factors because they follow the same analysis under the

circumstances of this case.  Under these factors, plaintiff has to show more than the presence of a

large single debt and defendant's desire to discharge that debt through bankruptcy.  Plaintiff has

to show an "intention to avoid a large single debt based on conduct akin to fraud, misconduct, or

gross negligence." *Indus. Ins. Servs. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir. 1991).

Here, the South Carolina court explicitly found, by clear and convincing evidence, that defendant

engaged in "reckless, willful, wanton or malicious" conduct that led to the need for compensatory

and punitive damages.  Defendant's situation thus differs from scenarios in which debtors sincerely

need a fresh start after trying a new business or artistic venture and failing.  *Cf. 1720 Ent. LLC v.
Palmer (In re Palmer)*, 419 B.R. 762, 769 (Bankr. M.D. Tenn. 2009) (no bad faith in filing for

bankruptcy after "owing more than $2.7 million in recoupment advances following only marginal

success of her first album").  Regardless of his financial situation, defendant has paid nothing to

plaintiff at all for seven years and counting after the South Carolina judgment issued.  No other

29

creditor has pursued him.  He has been able to afford a settlement with the Trustee in the First

Bankruptcy case and legal counsel to defend him in South Carolina.  With the help of his family,

defendant has not incurred debt for housing or for a vehicle.  Defendant testified at trial that he

filed both of his bankruptcy cases because he considered his debt to plaintiff unpayable and

because he felt overwhelmed by the amount of the judgment.  At his deposition, he testified that

the judgment had "made an impact on my entire family."  (SAP, Doc. No. 31-11 at 5.)  *Cf. In re*

*Lichtenstein*, 328 B.R. 513, 515 (Bankr. W.D. Ky. 2005) ("Debtor defiantly admitted at trial that

his sole purpose in filing this bankruptcy is to avoid the debt he owes to Barbanel and that he

would not have filed the case but for Barbanel's collection efforts.").  Plaintiff thus has established

the presence of these factors.

> ### 6)  *No Effort to Repay Debts*

This factor is straightforward and requires little discussion.  As noted above, defendant did

not contest at trial that he has not paid anything toward the satisfaction of plaintiff's judgment.

The evidence indicates that some funds have been available from the sale of defendant's residence

in 2019 and that at least several thousand dollars were available to pay toward the judgment.

During the pandemic, defendant instead invested that money in stocks and crypto currencies.  This

factor thus is present.

> ### 7)  *Unfair Use of Chapter 7, Transfer of Assets, and Overutilizing the Protection of the Bankruptcy Code*

These factors overlap somewhat with the factors pertaining to evasion, and the Court is

considering them together.  When courts assess the unfair use of Chapter 7, they look to see

whether debtors are trying to avoid their responsibilities to creditors by setting the letter of the

Bankruptcy Code against its spirit:

> One of the most important guides in making a decision as to whether or not
> there is "unfairness" in a debtor's use of Chapter 7, or the extent to which a debtor

> is "over-utilizing" the protections of the Code, should be the relief Congress
> specifically provided in the legislation itself. There are several instances in the
> Code where the exemption rights of debtors were balanced against the rights of
> creditors to the payment of their just debts. Those legislative choices, made by
> Congress, must inform the court's view of whether the Debtors in this case have
> overreached, and should be denied bankruptcy relief.

*In re McVicker*, 546 B.R. 46, 56 (Bankr. N.D. Ohio 2016) (citations omitted). Unfairness and

overutilization can manifest themselves in a debtor's efforts to frustrate creditor collection efforts

long enough either to use the debt as leverage in other negotiations or to see the creditors give up

and go away. *Cf. In re Eddy*, 288 B.R. 500, 508 (Bankr. E.D. Tenn. 2002) (case dismissed where

debtor avoided payment of a Chancery Court judgment involving life insurance funds and used

the funds "as leverage time and time again" against the beneficiaries); *In re Stump*, 280 B.R. 208,

216 (Bankr. S.D. Ohio 2002) (case dismissed where "Debtor and her family have engaged in

shielding assets" from creditors and where they "have taken many actions that were in response to

or in order to avoid creditor collection efforts").

Plaintiff has met her burden to establish these factors here. Defendant was a 50% owner,

with his grandfather, of numerous real estate parcels. Between 2010, when the dog attack

occurred, and 2012, when the South Carolina case began, defendant transferred every single

ownership interest to his grandfather for zero compensation. Defendant's testimony, both at his

deposition and at trial, was vague and evasive about why a grandfather who supposedly wanted to

ratchet down his real estate business after the 2008 recession suddenly wanted to be the full owner

of so many properties. If some explanation for the transfers—from the deposition of Mr. Brooks

taken for the First Adversary Proceeding or from other family members who were not subpoenaed

for deposition or trial—would make them appear less suspicious then the Court never heard it.

The result is a situation that looks very much as if defendant has turned his technical right to file

for bankruptcy into a sustained effort to make plaintiff go away without even trying to make any

payment on her judgment.  The situation troubled Judge Parsons enough that she decided not to proceed with the trial in the First Adversary Proceeding and directed the parties to engage in mediation to try to ensure that plaintiff would receive some redress for her injuries.  The Court concludes that defendant has contravened the spirit of Chapter 7.

8)  <em>Failure to Make Candid and Full Disclosure, and Multiple Bankruptcy Filings</em>

As applied to this case, these *Spagnolia* factors are related, and the Court will consider them together.  Like the factors discussed above concerning unfair use or overutilization, these factors look at whether a debtor is trying to separate the letter of the Bankruptcy Code from its spirit in a way that undermines the overall process.  The focus here is on a debtor's attitude toward the obligations of full disclosure as manifested through the procedural act of filings with a court:

> The real question should be whether the debtor is in bankruptcy with an intent to receive the sort of relief that Congress made available to petitioners under the chapter in question—subject, of course, to any statutory limitations on the extent of that relief—and is willing to responsibly carry out the duties that Congress imposes on debtors as the cost of receiving such relief.
>
> With the subject so identified, bad faith in the filing of a Chapter 7 petition would be evidenced by a pervasive and orchestrated effort on the part of the debtor to obtain the benefits of a bankruptcy filing while at the same time intentionally and fraudulently taking action to avoid any of the detriments.  Such an effort might involve an intention to file solely to interpose the automatic stay of 11 U.S.C. § 362(a) against pending litigation or foreclosure, without a concomitant acceptance of the statutory duties of financial disclosure, cooperation with the trustee, and surrender of non-exempt assets.  It might also be prompted by a vindictive motivation to use bankruptcy solely as a "scorched-earth" tactic against a pressing creditor or opponent in litigation.

*In re Khan*, 172 B.R. 613, 625 (Bankr. D. Minn. 1994) (citations omitted).  A lack of candor affects Section 707(a) in a way similar to how it affects challenges to discharge under Section 727: Major errors in statements and schedules can draw immediate attention, but minor errors can require the same attention if they accumulate.  *Cf. Capital One Equip. Fin. Corp. (In re Singh)*, 585 B.R. 330, 340 (Bankr. E.D.N.Y. 2018) ("The aggregate of misstatements and omissions of fact can

32

demonstrate a pattern of reckless disregard for the truth and intent of concealing information from the Court and its creditors.") (citations omitted); *Christofalos v. Kienlen*, No. 15 C 10832, 2016 WL 3268164, at *1 (N.D. Ill. June 14, 2016) ("Taken as a whole, the misrepresentations and omissions show that [the debtor] could not have cared less whether his schedules and statement of financial affairs were accurate."); *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 360 (Bankr. N.D. Ill. 2002) ("While the Court does not expect every individual item of clothing or piece of furniture to be scheduled and valued, or that each scheduled liability be listed with absolute arithmetic precision, there comes a point when the aggregate errors and omissions cross the line past which a debtor's discharge should be denied.") (citations omitted).

Here, several circumstances persuade the Court that these factors are present. Defendant has filed for bankruptcy twice within the last decade to avoid plaintiff's judgment. The First Bankruptcy Case prompted both the First Adversary Proceeding from plaintiff and a second adversary proceeding by the Trustee regarding defendant's property transfers to his grandfather. The litigants were frustrated, even after a Rule 2004 examination, by defendant's inability to produce more financial information than a limited amount of bank records that contained redacted or altered information. Defendant admitted being served with the South Carolina lawsuit, in contradiction to his denial in state court. Defendant also amended Schedule F to add a debt of $200,000.00 that he owed his grandfather from a loan, but no claim was ever filed in the First Bankruptcy Case. (FBC, Doc. No. 23 at 10.) The parties voluntarily dismissed the First Bankruptcy Case and First Adversary Proceeding after prompted by Judge Parsons to try to reach a resolution, but those efforts went nowhere. In the Second Bankruptcy Case and Second Adversary Proceeding, defendant testified inexplicably at his deposition that he cannot "live a normal life" because of a judgment that plaintiff barely has sought to enforce and that he has never

made any attempt to pay.  Defendant could not identify the source of remote deposits or the ownership of the bank accounts from which transfers were made into his Eastman Credit Union account.  Defendant readily admitted signing over a 50% ownership in numerous real estate parcels but refused to offer any insight as to what family dynamic would make him do so for zero compensation.  Finally, defendant insisted vehemently, at his deposition and at trial, that he could not provide statements and complete transaction histories for his Robinhood, Crypto.com, and Webull accounts—at times assuming a tone of disbelief that plaintiff should ask such an impossible task of him.  In the face of widely available online instructions to download statements and transaction histories from his accounts, defendant's  testimony on this subject is disingenuous. Rewarding defendant's repeated lack of transparency regarding his family's transactions is abusive of the bankruptcy process.  Under all of the above circumstances, the Court finds the plaintiff has met her burden for these *Spagnolia* factors.

### B.    Final Review of the Totality of the Circumstances

Mindful again that the *Spagnolia* factors are not a formula and that the totality of the circumstances matters the most, the Court concludes that the Second Bankruptcy Case features significant problems with bad faith.  In sum, defendant has filed two bankruptcy proceedings and continues to obfuscate financial details until plaintiff simply goes away.  The irony of defendant's persistent evasion is that full cooperation and disclosure of a sincerely impoverished lifestyle might have led to a discharge.  Whether defendant can or should be allowed to clear up his financial picture in a future bankruptcy proceeding will have to await another day.[3]  For now, plaintiff has

---

[3] Plaintiff never requested, in the event of dismissal, that defendant should be prohibited from refiling for any minimum period of time.  *See Cusano v. Klein (In re Cusano)*, 431 B.R. 726, 737 (B.A.P. 6th Cir. 2010) ("Where there is sufficient cause, bankruptcy courts have the authority pursuant to 11 U.S.C. §§ 105(a) and 349(a) to prohibit bankruptcy filings in excess of 180 days."), *quoted in Riddle v. Greenberger (In re Riddle)*, No. 19-8022, 2020 WL 3498438, at *10 (B.A.P. 6th Cir. June 29, 2020) (Chapter 7 debtor barred from refiling for three years following Section 707(a) dismissal).  The Court declines to impose any such prohibition *sua sponte*.

met her burden to show cause under Section 707(a).  The Court, accordingly, will grant plaintiff's motion to dismiss.

In the face of the dismissal of the Second Bankruptcy Case, the Court declines to address the alternative remedy of a denial of discharge under Section 727.  *See Sicherman v. Warner (In re Warner)*, No. 10-20997, 2011 WL 6140856, at *5 (Bankr. N.D. Ohio Dec. 9, 2011) (declining to address Section 727 after granting a motion under Section 707(a)).  Because the Second Adversary Proceeding addressed no other issues, the Court will dismiss it without prejudice.  *See In re Grannis*, No. 02-33321-K, 2003 WL 25949300, at *3 (Bankr. W.D. Tenn. Feb. 12, 2003) ("The dismissal of the main bankruptcy case generally results in the dismissal of all remaining adversary proceedings and contested matters that are pending at the time.").

## IV.    CONCLUSION

For all of the foregoing reasons, the Court will grant plaintiff's motion to dismiss defendant's Second Bankruptcy Case.  (Case No. 2:21-bk-50768-SDR, Doc. No. 15.)  The Court will dismiss the Second Adversary Proceeding (Adv. No. 2:22-ap-05002-SDR) in its entirety but without prejudice.

A separate order will follow.

# # #